## Killebrew, et al. v. Murray.

(Decided December 20, 1912.)

## Appeal from Woodford Circuit Court.

1. Lessor and Lessee—Land to be Mined for Phosphates—Royalties —Unilateral, Executory Contract.—A lease for ten years of land to be mined for phosphates which binds the lessor to furnish the land for a royalty of 25 cents per ton for the phosphate mined, but reserved to the lessees the right to begin or discontinue the work of mining the phosphate at any time within the ten years, or not commence at all, as they may elect, is a unilateral executory contract, which, because of its lack of mutuality is in law, unenforceable. Nor is a recited consideration of a rental of $5.00 per annum, to be paid the lessor by the lessee, for the year or years mining operations are not conducted, sufficient to give validity to the contract.

2. Lessor and Lessee—Validity of Contract—Reciprocity of Obligation.—Reciprocity of obligation is essential to the validity of such contract; and when by its terms the lessor is powerless to compel performance of its covenants by the lessee, but it confers upon the lessee the right to surrender the lease at any time and be released from all liability thereunder, the lease is void for want of mutuality.

3. Lessor and Lessee—False Representation of Lessor—Cancellation of Lease.—Where the lessor was induced to execute the lease for a royalty of 25 cents per ton on the phosphate to be mined, upon the representation of the lessee that such was the customary price paid under similar leases in Tennessee, and it was made to appear in evidence that the customary royalty in Tennessee, at that time, was one dollar to one dollar and ten cents per ton, instead of 25 cents per ton, and this was known to the lessees, but not known to the lessor at the time the lease was executed, the falsity of the representation thus made by the lessees was of itself sufficient to authorize the cancellation of the lease.

4. Lessor and Lessee—Mineral Operations—Contract Silent as to Beginning of Operations—Question of Fact.—Although a lease of the minerals in land is silent as to the time mining operations thereunder shall begin, it should nevertheless be construed to require that they be commenced within a reasonable time, if the condition of the parties and the circumstances surrounding the execution of the lease made it necessary to protect the rights of the parties and effect the object for which the lease was executed. What is a reasonable time for the performance of conditions in a contract, is a question of fact to be determined by all the circumstances of the case.

5. Lessor and Lessee—Lessee Should Begin Performance in Reasonable Time—Abandonment.—Where, under a lease of minerals it is the duty of the lessee to begin performance within a reasonable

time, and he fails to do so, such failure may be treated by the lessor as an abandonment of the lease by the lessee, entitling the lessor to sue for its forfeiture or cancellation.

RICHARD GODSON, BRUCE & BULLITT, W. O. DAVIS and HELM BRUCE for appellants.

D. L. THORNTON, FIELD McLEOD and WALLACE & HARRIS for appellee.

OPINION OF THE COURT BY JUDGE SETTLE—Affirming.

This is an appeal from a judgment of the Woodford Circuit Court declaring invalid and canceling a certain lease, held by appellants upon the land of appellee. Such parts of the lease as are pertinent to the questions involved are here copied:

"This phosphate lease made this the second day of September, 1908, by and between Mrs. Margaret Murray (unmarried), party of the first part, and George W. Killebrew, of Mt. Pleasant, Tennessee, party of the second part, witnesseth as follows: The party of the first part for and in consideration of one dollar ($1.00) and of the covenants hereinafter contained on the party of the second part, has leased unto the party of the second part for the sole and only purpose of mining and excavating for phosphate and phosphate bearing rock, all that certain tract of land situate in Woodford County, in the State of Kentucky, containing one hundred and fifty-five (155) acres more or less described as follows: * * *

"TO HAVE AND TO HOLD said premises above described unto the party of the second part for and during the term of ten years from the date hereof, and so long thereafter as phosphate or phosphate bearing rock may be found, in what shall be considered by the party of the second part as paying quantities. When the party of the second part shall conclude that phosphate or phosphate rock is not found on said premises in paying quantities, he shall notify the party of the first part thereof in writing, and such notice shall terminate this lease, which, however, shall continue until such notice. The party of the second part hereby covenants and agrees in consideration of this lease, to pay unto the party of the first part 25 cents per ton of 2,240 pounds as a royalty for the phosphate when mined and removed; and agrees to pay a minimum of $5.00 per an-

num, whether the lands are mined or not, such payments to be considered an advance on the royalty and to be deducted from the royalty on the first phosphate mined thereafter. The party of the second part shall have the right to determine when and how much of said land shall be mined during each year during the continuance of this lease, provided always that said minimum sum of $5.00 per annum shall be paid each year during the continuance thereof, which amounts, as aforesaid, shall be considered as advancements and shall be deducted from the royalty on the phosphate thereafter mined. * * *,,

The lease was signed by appellee alone, and her attack upon it was based on the grounds:

1st. That it was without consideration, and so lacking in mutuality as to render it per se invalid.

2d. That it was procured by fraud.

3d. That if appellants ever had any intention of carrying out the lease it had been abandoned by them; and that their continuing to claim under the lease was not in good faith, but for the purpose of finding a purchaser of the lease to whom they could sell it at a profit.

It is insisted for appellants that the ground of attack last mentioned should have been ignored by the circuit court, as it was set up by appellee's reply, when it should have been relied on in the petition or by an amended petition. This contention is without force, in view of the fact that appellants did not demur to that part of the reply or move to strike it out, but by rejoinder traversed its affirmative allegations. This was a waiver of appellee's error and an election on appellants' part to treat that part of the reply as an amended petition; and as the circuit court so held, its ruling thereon was not error. Ruffner v. Girdley, 81 Ky., 165.

It must be taken for granted that the purpose of appellee in granting the lease was to obtain an income or profit in royalties from appellants' mining of her land, in the purchase of which she had expended $23,000. It even appears from the admissions of some of the appellants that they represented to her before the lease was executed, that the mining of the phosphate on her land would pay her in royalties $500 per acre. It could not have been contemplated by her that she would receive no part of this royalty for ten years after the execution of the lease. On the contrary, she was assured by appellants before its execution that they would

begin the work of getting out the phosphate within a year or eighteen months, yet, though more than three years intervened between the date of the lease and the institution of this action, nothing was done by them.

It is, however, appellants' contention that such non-action was allowed by the contract and that it may, indeed, continue for ten years, if appellee be paid by them the $5.00 per annum, which the lease provides shall be received by her, whether the lands are mined or not.

Is this the meaning of the contract; and, if so, is the contract a valid one?

It was alleged in the petition and proved by appellee that the consideration of $1.00, recited in the lease, was never paid nor is its payment acknowledged in the writing. The only matter relied upon by appellants as showing a consideration is the sum of $5.00 which they agreed to pay appellee annually, whether the land was mined or not, and she only accepted one such payment, which was made one year from the date of the contract; others, though tendered, being refused, because of appellants' failure to begin work under the lease.

It is not to be presumed that appellee would have encumbered her farm with the lease for these annual payments of $5.00, in view of its insignificance as a return upon her investment of $23,000 in the farm. It is manifest, therefore, that the real consideration or inducement for the granting of the lease was the mining of the phosphate upon the land, which she supposed, and was led by appellants to believe, they would commence within a reasonable time; and this conclusion is sustained by the fact that the annual payments of $5.00 were to be regarded as mere advancements upon the royalty that appellee would receive from the mining of the land, to be credited to appellants upon the royalty first thereafter due appellee.

We do not concur in the conclusion of appellants' counsel that the contract in question is an executed contract. In our opinion it must be classed as an executory contract merely. Under it nothing had been done; everything required by its terms of appellants, was to be thereafter done. All that it required of appellee was that she should furnish the land, and this was done when the lease was executed. On the other hand, what it required of the appellants—payment of the consideration, mining of the land for phosphates, accounting to the appellee for the royalties—was to be thereafter

done in fulfillment of the contract. The insignificant $5.00 per year it obligates appellants to pay appellee, whether the land is mined or not, is not of itself sufficient to place the lease in that class of contracts known as executed contracts. But whether it be denominated an executed or an executory contract it is manifestly lacking in mutuality. It obligates the lessor in unequivocal language to continue the lease for ten years, all the while holding the leased premises in readiness for the lessee's mining operations, but gives her no right to terminate the lease, to compel the lessees to begin mining the land, or to continue the work, if abandoned, after being commenced. On the other hand, the lease does not bind the lessees to do anything. It permits them to begin the work of mining phosphate on the leased premises at any time, within ten years, that may be selected by them; to quit when they choose, or not to begin at all; and also the right to terminate the lease at any time upon their mere ipse dixit that the land does not contain phosphate in "paying quantities;" it being left to them alone to decide whether it is in quantity sufficient to make the mining thereof profitable to them.

Reduced to its last analysis this lease is but a unilateral executory contract, such as is in Berry v. Frisbie, &c., 120 Ky., 337, declared void; and in Young v. McIlhenney, 116 S. W., 728, held to be unenforceable. In Berry v. Frisbie, &c.; supra; the lease, while in some respects dissimilar to that in the case under consideration, was, in others, closely akin to it. For instance, it contained the provision that, "should minerals, coals, ores, oils, gases, etc., be found on the leased land in quantities which in the judgment of the said Frisbie and his associates or assignees will pay to work, etc." While in the lease here involved a similar provision is thus expressed: "When the party of the second part (lessee) shall conclude that phosphate or phosphate bearing rock is not found on said premises in paying quantities, etc." It is manifest that each of these provisions put it in the power of the lessees to begin or discontinue mining operations upon the leased premises as they might elect. The meaning and effect of the provision quoted from the lease in the case of Berry v. Frisbie, &c., is explained in the opinion in that case as follows:

"But if his lessees were not bound in fact to sink a well or wells upon the land to test its mineral proper-

ties, yet could keep appellant and all others from doing so, it would be in the power of the lessees to prevent its development indefinitely or forever. In that way the lessor would get nothing from his lease; would get nothing from even the chance of finding minerals there. In this view of the contract, it does not bind the lessees either to sink a well upon the land or to work the wells if sunk, and if minerals should be found in paying quantities. They could in that way, though satisfied that the land did contain oil and gas, and though it be a fact that it did, get from it these properties without paying anything, by draining them off through wells tapping the same pools or veins on the adjacent lands. Or they could plug the holes, and indefinitely postpone working the wells. Such contracts lack the mutuality essential to their validity. A unilateral executory contract is in law a *nudum pactum*, and is unenforceable. Where it is left to one of the parties to an agreement to choose whether he will proceed or abandon it, neither can specifically enforce it in equity. (Litz v. Goosling, 93 Ky., 185; Federal Oil Co. v. Western Oil Co., 112 Fed., 373; Marble Co. v. Ripley, 10 Wall, 339.) Nor is the recited consideration of $1.00 sufficient to uphold an action for the specific enforcement of a contract otherwise unsupported by consideration. As was said in Federal Oil Co. v. Western Oil Co., *supra*, 'The consideration would be so trifling, compared with the value of the leasehold interest as to shock the moral sense.' ''

In Young v. McIlhenney, *supra*, the lessee also had under the contract the sole right of development, and, as in the instant case, of indefinitely delaying or refusing to begin the work, yet retaining the option of protecting such right by small annual payments. After declaring that there was nothing in the lease binding the lessee to do anything; that the right to bore for oil or gas was purely optional with the lessee; that the lessor, though bound by the contract, could not compel the lessee to commence operations or continue them, the opinion quoted as applicable to the case the following excerpt from Litz v. Goosling, &c., 93 Ky., 185:

"Reciprocity of obligation is, however, essential to the validity of a contract, and it is a general rule that in order to be binding upon, or enforceable by, one party, it must be so as to both. This is the very essence of it."

And also the following from Donahue on Petroleum, &c., 155:

"Where the lessee has a right to surrender the lease, at any time, and be released from all liabilities under the lease, the lease is void for want of mutuality. * * * Where an oil or gas lease fails to bind the lessee to prosecute the work diligently, and the consideration for the lease is part of the oil or gas produced, the lease is void for want of mutuality. * * * A part of the oil produced as a construction for the lease, and so much per well for gas, and in case no wells are sunk, the lease to be null and void, unless the lessee paid a certain sum in advance for each quarter, the lease is but an option and does not bind the lessee to pay any sum, and may be avoided by either party."

In Tennessee Oil, &c. Company v. Brown, 131 Fed. Rep., 696, the action was one to obtain the cancellation of a lease as to coal and timber, as well as oil and gas—the lease containing a provision to the effect that the lessee should have the right to abandon the lease and mining at any time, and remove all his buildings and fixtures from the lands—Judge Lurton in the opinion rendered, after apparently holding that the lease was an executory contract, said:

"But independently of any other ground the chief provision of this lease authorizing the lessee to abandon whenever he should see fit, makes it a lease at the will of the lessee. An estate terminable at the will of one of the parties is determinable at the will of the other, though it purports to be terminable at the will of only one."

The fact that the cases of Berry v. Frisbie, &c., and Young v. McIlhenney, involve leases with respect to oil and gas which are "migratory," does not make the doctrine announced in those cases inapplicable to a lease as to coal or phosphate, although it may be, and doubtless is true, that the failure of the lessee to proceed with the work of development, would be held to operate as an abandonment of an oil or gas lease, in a shorter time, than if such failure were to result in the case of a coal or phosphate lease, because of the greater danger of loss by delay.

No reason is apparent for declaring that this lease should be held to be different from any other lease which is determinable at the will of one party and therefore determinable, in law, at the will of either party. We are of opinion that it authorizes the lessee at any time, by written notice, to terminate the lease, and, this being

true, the general rule laid down in Berry v. Frisbie, &c., and Young v. McIlhenney, *supra*, and also by the authorities upon the law of landlord and tenant, makes it terminable at the will of the lessor. 1st Washburn on Property, 371; Taylor's Landlord and Tenant, section 14; 18 American & English Encyclopedia of Law, 182.

Indeed, regarding the language and meaning of the lease as a whole, its obvious purpose was to bring about the development and sale of the minerals underlying the lessor's lands, which purpose, the conduct of the lessee has prevented from being carried out; in view of which and the fact that there is no provision of the lease under which the lessor can require the lessee to pay, or do, or perform, its want of mutuality authorized its cancellation as the circuit court adjudged.

We think it also apparent from the evidence that the lease was procured by fraud on the part of the appellants and their agent Garrett. Such fraud is shown by positive and direct evidence introduced in behalf of appellee, which was only evasively controverted by that of appellants. In order to induce appellee to execute the lease, it was, in substance, represented to her by the appellant, Stark—who is, admittedly, interested with the appellant Killebrew in the lease—and by Garrett, the immediate representative of Killebrew, that the mining of the prosphate on her land, as they proposed to conduct operations if she would execute the lease, would pay her at the rate of $500 per acre "on all the rock territory or rock area where it could be mined." Stark also represented to appellee that she would receive the customary royalty paid in Tennessee for such phosphate as was mined on her land, which he claimed was 15 to 25 cents per ton, but that more of such leases were obtained at 15 cents than 25 cents; and he and Garrett further represented to her that mining for the phosphate on her land, would be commenced within a year or, at most, eighteen months, following the execution of the lease. According to her evidence appellee believed these representations and was induced by them to execute the lease, when without them she would not have done so. She seems to have especially relied upon what Stark said to her, as he was related to her by marriage and fully possessed her confidence. He, however, concealed from her the fact that he was to be interested with Killebrew in the lease, and informed her that he wished to see her enter into the lease only because Killebrew would take

a similar lease on his land if he could secure the lease on hers.

It appears from the weight of the evidence that the above representations were untrue, for the prevailing price or royalty paid at that time in Tennessee to the lessor on brown phosphate rock, such as underlies appellee's land, was $1 to $1.10 per ton, which was known to Stark as he had been to Tennessee and there ascertained the customary royalty.

The falsity of the further representations made both by Stark and Garrett is also patent, as the mining of appellee's land was not commenced within a year or eighteen months of the execution of the lease, or at all; and neither $500 per acre nor any other amount, in royalties, has been realized by her from the mining of her land.

As previously stated, Stark and Garrett were evasive in testifying as to the representations they made appellee to procure the lease. This is particularly true of Stark's deposition; his answers to questions as to such representations being, in the main, that he did not remember the conversation, or didn't recall saying what was attributed to him as such representations, by the evidence in behalf of the appellee.

In view of the foregoing evidence as to the manner in which the lease was obtained from appellee, to say nothing of the gross inadequacy of the royalty it stipulates she shall receive and the like inadequacy of the $5 per annum rental by virtue of which appellants seek to hold the land without mining it, we are constrained to believe that its execution was unfairly, even fraudulently procured.

We are also of opinion that appellee's third contention is sustained by the facts presented by the record; that is, that appellants had no intention of carrying out the provisions of the lease and that their failure to do so was, in legal effect, an abandonment of it, which entitled appellee to its cancellation as adjudged by the circuit court.

As already observed, appellee's purpose in granting the lease was to obtain an income or profit, by way of royalties, from the mining of phosphate on her land by appellants; and in view of their representations as to the abundance of the phosphate, and their purpose to begin the work of mining it within a year or eighteen months, it cannot be doubted that she expected a handsome income in royalties, from year to year, beginning

with their mining operations, and continuing throughout the entire term of the lease. It would be doing violence to her intelligence, and that of appellants as well, to say that she was induced to execute the lease and thereby encumber her farm, which had cost her $23,000, because of appellants' undertaking to pay her the paltry sum of $5 per annum during the continuance of the lease; nor is it to be presumed that she would have executed the lease if she had known that appellants had no intention of beginning work within a reasonable time or that it was not their intention to begin at all. On the contrary, in the absence of a provision in the lease fixing the time for them to begin the work of mining, the presumption should be indulged that it was to begin within a reasonable time; and what would be reasonable time, is a question of fact to be determined by all the circumstances of the case.

Here the lease is silent as to the time of appellants beginning operations, but the facts and circumstances attending its execution unmistakably show that they were to begin within a year or eighteen months, and as this time was fixed by appellants themselves, it must be considered a reasonable time.

In Eastern Ky. Mineral & Timber Co. v. Swann-Day Lumber Co., 148 Ky., 82, we had under consideration an instrument of writing, conveying the fee to a seven-eighths interest in the minerals and timber on a tract of land. Certain of its provisions read as follows:

"The grantor reserves one-eighth interest in the mineral and timber of said land, outside of the seven-eighths conveyed, and is to share with grantees as above mentioned. That is to say, the grantor is to receive one-eighth of the net profits of all minerals and timber taken from said tract, so soon as mining operations commence; said grantor also reserving of the timber herein conveyed, a sufficient quantity for mill, fuel and fencing for his own use on his farm. This deed is not to embrace, or intended to convey, anything but the minerals and timber as stated, and not to interfere with the farming interest of said territory, only so far as is necessary to work and mine minerals, and getting out timber."

In construing this writing we held it to be a lease, which, though silent as to the time of beginning operations thereunder, required the grantee to do so within a reasonable time, as the condition of the parties and the circumstances surrounding the execution of the paper

made it necessary that this be done to protect the rights of the grantor and to effect the intention of the parties. Moreover, that the grantee having failed to begin the contemplated work within a reasonable time, such failure was properly treated by the grantor as an abandonment by the grantee of the leased premises entitling him to take possession thereof.

An excellent statement of the doctrine elaborately discussed in the case, supra, is contained in a note to Chauvenet v. Person (217 Pa., 461), 11 L. R. A., 417, wherein the editor, in a review of numerous cases on the subject says:

"Generally, all leases of land for the exploration and development of minerals, are executed by the lessor in the hope and upon the condition, either express or implied, that the land shall be developed for minerals; and it would be unjust and unreasonable, and contravene the nature and spirit of the lease, to allow the lessee to continue to hold under it any considerable length of time without making any effort at all to develop it according to the express or implied purpose of the lease; and in general, while equity abhors a forefeiture, yet, when such a forfeiture works equity, and is essential to public and private interests in the development of minerals in land, the landowner, as well as the public, will be protected from the laches of the lessee and the forfeiture of the lease allowed, where such forfeiture does not contravene plain and unambiguous stipulations in the lease."

To the same effect are the following additional authorities: Shenandoah Land & Coal Co. v. Heiss, 92 Va., 238; Aye v. Philadelphia Co., 193 Pa., 451; 2 Page on Contracts, section 1123; Adams v. Ore Knob Copper Co., 7 Fed. Rep., 634; 2 Snyder on Mines, section 1136.

The rule laid down in the foregoing authorities must control in the case at bar. Looking at the lease in question, the situation of the parties, and the circumstances attending its execution, it cannot be doubted that it by fair implication imposed upon the lessees the duty to begin mining operations within a reasonable time, in order that appellee might receive the real and an adequate consideration for granting the lease.

A year or eighteen months was fixed by appellants as a reasonable time, yet they failed to begin work within that time or at all. After waiting three and a half years for appellants to begin operations, during which time they made no efforts to do so, appellee rightfully treated

their inaction as an abandonment by them of the contract, therefore she had the right to bring suit for its forfeiture or cancellation.

Being of the opinion that the judgment of the circuit court properly determined the rights of the parties, it is hereby affirmed.

Whole court sitting.